1
2
3
4
5                    **UNITED STATES DISTRICT COURT**

6                          **DISTRICT OF NEVADA**

7

8    TONY DeANGELO SWANSON,

9          Petitioner,                          3:07-cv-00232-RCJ-VPC

10   vs.
                                                **ORDER**
11   DWIGHT NEVEN, *et al.*, [1]

12         Respondents.

13   _____/

14

15   Introduction

16         This habeas corpus action is brought by Tony DeAngelo Swanson, a Nevada prisoner.

17   Swanson's federal habeas corpus petition is before the court on its merits.  The court will deny the

18   petition, and will deny Swanson a certificate of appealability.

19   Procedural History and Factual Background

20         On April 28, 2000, Swanson was charged in a criminal complaint with one count of sexual

21   assault with a minor under 14 years of age (NRS 200.364 and 200.366) and one count of lewdness

22

23
     _____
24         [1]  The petitioner is incarcerated at Nevada's High Desert State Prison.  The warden of High
     Desert State Prison is Dwight Neven.  Therefore, pursuant to Federal Rule of Civil Procedure 25(d),
25   Dwight Neven is substituted for E.K. McDaniel as the respondent warden.  Also, Adam Paul Laxalt is
     now Nevada's attorney general; therefore, pursuant to Federal Rule of Civil Procedure 25(d), Adam Paul
26   Laxalt is substituted for Catherine Cortez Masto as the respondent Attorney General of the State of
     Nevada.  The court  will direct the Clerk of the Court to update the docket for this case in these respects.

with a child under the age of 14 (NRS 201.230). *See* Criminal Complaint, Exhibit 2.[2]  A warrant

issued for Swanson's arrest on May 1, 2000. *See* Arrest Warrant, Exhibit 4.  Swanson was arrested

on November 21, 2000. *See* Exhibits 5, 6, and 7.   A preliminary hearing was held in the Las Vegas

Township Justice Court on December 21, 2000, and Swanson was bound over for trial. *See*

Transcript of Preliminary Hearing, Exhibit 8; Commitment and Order to Appear, Exhibit 9.  An

information was filed in the district court on December 28, 2000. *See* Information, Exhibit 11.

On May 17, 2001, Swanson filed a motion, *pro se*, to have his counsel discharged and for

appointment of new counsel. *See* Pro Se Motion, Exhibit 12.  The court held a hearing on that

motion on May 31, 2001; Swanson complained about his counsel and stated that he would rather

represent himself. *See* Reporter's Transcript,  May 31, 2001, Exhibit 13.  The court continued the

hearing to June 6, 2001. *See id*. at 6-7.  On June 6, 2001, Swanson told the trial court that he had

spoken with his counsel, had a change of heart, and wanted his appointed counsel to represent him at

trial. *See* Reporter's Transcript,  June 6, 2001, Exhibit 14.

On June 29, 2001, the prosecution filed a motion seeking admission of evidence of another

crime committed by Swanson. *See* Motion to Admit Evidence of Other Crimes, Exhibit 15.  Over

the next several months, the court held hearings regarding that motion, and also regarding the

scheduling of the trial. *See* Exhibits 16-19, 21, 22, 24-26.

The trial commenced on January 13, 2003. *See* Transcript of Trial, January 13, 2003,

Exhibit 27.  Before the trial started, the court entertained argument regarding the State's motion to

admit evidence of other crimes, and granted the motion. *See id*. at 1-14.  Also, before the trial began,

there was discussion regarding disagreement between Swanson and his counsel regarding whether to

call certain witnesses. *See id*. at 26-33.  The jury was then chosen. *See id*. at 33-206.

On the second day of trial, January 14, 2003, after the jury was chosen but before opening

statements, there was discussion, with the jury absent, regarding disagreement between Swanson and

---

[2]  Unless otherwise specified, the exhibits referred to in this order are those filed by Swanson in support of his first amended habeas petition, and found in the record at ECF Nos. 24, 25 and 26.

his counsel regarding whether to call certain witnesses.  *See* Transcript of Trial, January 14, 2003, Exhibit 28, pp. 3-30.  Swanson's counsel stated that he did not feel he could represent Swanson if Swanson insisted on calling the witnesses.  *Id*. at 15.  Swanson then asked to represent himself.  *Id*. After canvassing Swanson at length, the court allowed Swanson to represent himself  for the remainder of the trial.  *Id.* at 29.

The first witness called by the prosecution was the victim, RS.[3]  Transcript of Trial, January 14, 2003, Exhibit 28, pp. 39-74.  RS was twelve years old when she testified; she was nine years old in January of 2000.  *See id*. at 40.  RS testified that on January 23, 2000, she was at her grandfather's two-story apartment, along with her two sisters and brother, and Swanson.  *Id*. at 45. There were no other adults present.  *See id*. at 45, 49.  RS testified that on that night she and her two sisters and a brother were upstairs going to bed, and she went downstairs to get water for one of her sisters.  *See id*. at 45-46.  Swanson was downstairs, and he called RS over to him.  *Id*. at 46.  RS testified that she went and sat next to him.  *Id*.  RS testified as follows about what happened then:

> Q.    What did he do after you sat down?
>
> A.    He stuck his finger in my panties and my shorts.
>
> Q.    Did he stick them inside your underwear?
>
> A.    Yes.
>
> Q.    Did he stick them inside your body?
>
> A.    Yes.
>
> Q.    What do you call that part of your body where he put his fingers?
>
> A.    My koochie.
>
> Q.    What did he say to you when he did that?
>
> A.    He didn't say nothing.
>
> Q.    What happened; did it hurt?

[3] The victim in this case, and the victim in Swanson's prior case, were minors at the time of the crimes and at the time of the trial in this case.  The court refers to them in this order as RS and TB, respectively.

1     A.     Yes, a little.

2     Q.     Can you tell us whether or not you were frightened?

3     A.     I was scared.

4     Q.     Did you say anything to Tony?

5     A.     I didn't say nothing but stop.

6     Q.     After you told him stop what happened?

7     A.     He then stopped until like a few minutes after that.

8     Q.     What happened a few minutes after that?

9     A.     Um, after a few minutes after that I was going up the stairs and he
10   squeezed my butt.

11   Q.     Inside or outside of your clothes?

12   A.     Outside.

13   Q.     Did he touch you anywhere else on your body that you didn't want to
      be touched?

14   A.     No.

15   He touched my titties, but that was before, like when I saw, told him to stop.
      He waited a few minutes after that, but it was before he waited a few minutes before I
16   told him to stop.

17                                    *     *     *

18   Q.     Back when you were seated with him downstairs that's when he placed
      his hand on your chest?

19   A.     Yes.

20   Q.     What happened after you were going up the stairs?

21   A.     After I was going up the stairs, I went upstairs and I went up and to the
22   room and I started crying.  I told my – my sisters and them heard me crying and I told
      them what happened.

23   Q.     By the time you got upstairs did you feel any pain at all?

24   A.     No, not until I went to go pee, but I waited until the morning because I
25   didn't want to leave back out of the room.

26   I stayed in bed until the morning and then I went to go pee and it was hurting.
      I was [peeing], so I was [peeing] a little at a time.

1          Q.     Did you stay upstairs in the bedroom for the rest of the night?

2          A.     Yes.

3 *Id*. at 47-49; *see also id.* at 46 ("I sat down and I sat next to him and he started [to] stick his finger in

4 me."). RS testified that the next morning she went outside, and saw Swanson, and told him she was

5 going to tell her mother what happened. *Id*. at 49-51. She testified that Swanson told her not to tell

6 her mother. *Id*. She said she was going to tell her mother because it hurt for her to pee. *Id*. She

7 testified that she went back in the apartment, and called her mother at work and told her what

8 happened. *Id*. Her mother later picked her up from her grandfather's apartment and took her to a

9 hospital. *Id*. at 53. RS testified that she told people at the hospital what had happened. *Id*.

10      On cross-examination, Swanson asked RS about events that occurred on the morning of

11 January 24, 2000, and RS testified as follows:

12          A.     Early the next morning, that's the -- that's when, yeah, Sunday
morning and then I had -- when we had went upstairs, I had went upstairs first and

13      you came upstairs and you were sitting up in that chair and then you called me up in
there and that's when you was about to do it again.

14

          I said no and I went inside.

15

16 *Id*. at 64.

17      Next, the prosecution called RS' mother to testify. Transcript of Trial, January 14, 2003,

18 Exhibit 28, pp. 74-91. She testified that RS' grandfather, Jimmy Swanson, occasionally took care of

19 her children at his apartment. *Id*. at 75-76. She testified that on January 24, 2000, she received a call

20 at work from RS. *Id*. at 77. RS was crying and told her that "her privacy was hurting," and she

21 could not pee. *Id*. at 77-78. RS told her: "He was putting his finger in me." *Id*. at 78. She testified

22 that she then dropped the phone and left work to go get RS. *Id*. at 78-79. At the apartment, she

23 found RS crying, sitting on a toilet trying to urinate, and repeatedly saying that she could not. *Id*. at

24 91. She testified that RS told her that Swanson had done it. *Id*. at 79. RS' mother took her to a

25 hospital. *Id*. at 79-80.

26

1          The State then called Colleen Baish to testify.  Transcript of Trial, January 14, 2003,

2    Exhibit 28, pp. 92-97.  Baish, a "child life specialist" at Sunrise Children's Hospital in Las Vegas,

3    testified that she recalled RS coming into the hospital with her mother and two siblings in January of

4    2000.  *Id*. at 92-94.  Baish interviewed RS.  *Id*. at 94-96.  When she asked RS why she was at the

5    hospital, RS said:  "Because Tony put his finger in me."  *Id*. at 96.

6          Next, the prosecution called as a witness George Libby, a detective with the Las Vegas

7    Metropolitan Police Department (LVMPD).  Transcript of Trial, January 14, 2003, Exhibit 28, pp.

8    97-107.  Libby testified that he and another LVMPD detective went to Sunrise Children's Hospital

9    when RS was there on January 24, 2000.  *Id*. at 99, 104.  He testified that he spoke with a doctor who

10   examined RS, and the doctor told him that RS had an abrasion on her hymen, and that was probable

11   evidence of sexual assault or abuse.  *Id*. at 100.  Detective Libby testified that he then interviewed

12   RS.  *Id*. at 100-01, 105.  RS told him that someone she knew as "Tony" "had touched her buttocks

13   and digitally penetrated her vagina with his finger."  *Id*. at 101.  Detective Libby testified, on cross-

14   examination, that he later spoke with RS' mother and RS' grandfather, to determine who "Tony"

15   was.  *Id*. at 102-03.

16         On the third day of trial, the prosecution called Marc O'Connor, M.D., a pediatric emergency

17   doctor at Sunrise Children's Hospital.  Transcript of Trial, January 15, 2003, Exhibit 29, pp. 3-20.

18   Dr. O'Connor examined RS.  *See id*. at 6-8.  He found that there was abrasion on RS' hymen.  *Id*. at

19   8.  He testified that, base on his examination, "there probably was internal penetration of some

20   sorts."  *Id*.  He concluded it was probable that RS had been sexually abused.  *Id*. at 9.  Dr. O'Connor

21   testified that, in his experience, there was nothing besides internal penetration that could cause such

22   an abrasion.  *Id*.

23         Next, the prosecution called as a witness RS' grandfather, Jimmy Swanson.  Transcript of

24   Trial, January 15, 2003, Exhibit 29, pp. 20-47.  It was in his apartment where RS was sexually

25   assaulted.  Jimmy Swanson testified that on the night in question, Swanson was at his apartment, as

26

6

1  were RS and her two sisters and brother.  *Id*. at 24-25.  Jimmy Swanson testified that RS never said it

2  was anyone other than Swanson who sexually assaulted her.  *Id*. at 45.

3        The prosecution then called to the witness stand TB, a 14-year-old girl, to testify regarding a

4  prior, similar crime committed by Swanson.  Transcript of Trial, January 15, 2003, Exhibit 29, pp.

5  48-56.  TB testified that on December 30, 1998, when she was eleven years old, she was riding a

6  bicycle with some friends, and Swanson called to them from the door of an apartment and offered

7  them candy.  *Id*. at 49-50.  TB testified that she approached Swanson.  *Id*. at 50.  She testified as

8  follows about what happened then:

9        A.     I walked in and I heard the door lock and I walked towards the candy
   and Mr. Swanson came up behind me and took his hands and went from my mid-
10  thigh all the way up to my back pockets and he whispered in my ear to keep it
   between me and him.

11                                    *   *   *

12        Q.     This was over your clothes?

13        A.     Yes.

14        Q.     And where his hands reached you said to your pockets, was that on
15  your bottom?

16        A.     Yes.

17        Q.     Did you want him to touch you?

18        A.     No.

19        Q.     What did you do after this happened?

20        A.      I pushed him away and ran home and told my mother?

21        Q.     Were you able to get out of the door?

22        A.     Yes.

23        Q.     You said it was locked, correct?

24        A.     Yes.  I unlocked it and ran out the door.

25  *Id*. at 51-52.  The prosecution then read to the jury, from a transcript, admissions that Swanson made

26  regarding the incident involving TB.  *Id*. at 54-55.

1        The State then rested its case. *Id*. at 55.

2        Swanson re-called RS to the witness stand. Transcript of Trial, January 15, 2003, Exhibit 29,

3   pp. 57-63. Swanson also re-called Jimmy Swanson. *Id*. at 111-12. On the fourth day of trial,

4   January 16, 2003, Swanson put into evidence a police report regarding the incident involving RS.

5   Transcript of Trial, January 16, 2003, Exhibit 30, pp. 39-40. That concluded the defense case.

6        On January 17, 2003, the jury returned verdicts, finding Swanson guilty of one count of

7   sexual assault with a child under fourteen years of age, and guilty of one count of lewdness with a

8   child under the age of fourteen. Transcript of Trial, January 17, 2003, Exhibit 31, pp. 2-3; Verdict,

9   Exhibit 32.

10       On February 26, 2003, Swanson was sentenced, for the sexual assault with a child under

11  fourteen years of age, to life imprisonment with the possibility of parole after twenty years, and, for

12  the lewdness with a child under the age of fourteen, to a consecutive sentence of life imprisonment,

13  with the possibility of parole after ten years. *See* Transcript of Sentencing, Exhibit 34. The

14  judgment of conviction was entered on March 14, 2003. *See* Judgment of Conviction, Exhibit 35.

15       Swanson appealed. *See* Notice of Appeal, Exhibit 36. Counsel was appointed for Swanson

16  for his appeal. *See* Transcript, April 24, 2003, Exhibit 43; Order, Exhibit 47; Notice of Appearance

17  of Counsel, Exhibit 49. On May 19, 2005, the Nevada Supreme Court affirmed the judgment of

18  conviction. Order of Affirmance, Exhibit 70.

19       On April 6, 2006, Swanson, acting *pro se*, filed a petition for writ of habeas corpus in the

20  state district court. Petition for Writ of Habeas Corpus, Exhibit 79. Swanson requested an

21  evidentiary hearing. Request for Evidentiary Hearing, Exhibits 81, 83. The court held a hearing on

22  August 4, 2006, and Swanson was transported to the court for that hearing. *See* Order for Production

23  of Inmate, Exhibit 90. However, at the August 4, 2006, hearing, Swanson refused to participate.

24  *See* Reporter's Transcript, August 4, 2006, Exhibit 91, pp. 3-4. The court briefly questioned

25  Swanson's trial counsel. *See id*. at 4-8. On October 31, 2006, in a written order, the state district

26  court denied Swanson's petition. Findings of Fact, Conclusions of Law and Order, Exhibit 96.

1   Swanson appealed.  Notice of Appeal, Exhibits 93, 94, 99.  The Nevada Supreme Court affirmed on

2   April 6, 2007.  Order of Affirmance, Exhibit 102.

3          Swanson initiated this federal habeas corpus action, by sending a *pro se* habeas corpus

4   petition to the court for filing, on May 13, 2007 (ECF Nos. 1, 5).  Counsel was appointed to

5   represent Swanson (ECF Nos. 12, 15).  With counsel, Swanson filed a first amended petition for writ

6   of habeas corpus on September 28, 2003 (ECF No. 23).

7          Respondents filed a motion to dismiss on March 20, 2009 (ECF No. 36).  The court granted

8   the motion to dismiss on September 22, 2009 (ECF No. 43), and dismissed Swanson's first amended

9   petition on the ground that all three claims were barred by the statute of limitations.  Swanson

10  appealed (ECF No. 45).   The court of appeals affirmed with respect to the dismissal of Ground 3 of

11  Swanson's first amended habeas petition, but reversed with respect to the dismissal of Grounds 1

12  and 2 (ECF No. 49).  The court of appeals remanded the case to this court for further proceedings.

13         On April 25, 2013, respondents filed an answer (ECF No. 53), responding to Grounds 1

14  and 2.  Swanson filed a reply on July 12, 2013 (ECF No. 56).  Swanson's first amended habeas

15  petition is now before the court with respect to the merits of Grounds 1 and 2.

16  Standard of Review

17         Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254

18  enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply.  *See Lindh v.*

19  *Murphy,* 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000),

20  overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003).  28 U.S.C. § 2254(d) sets

21  forth the primary standard of review under AEDPA:

22                    An application for a writ of habeas corpus on behalf of a person in custody
            pursuant to the judgment of a State court shall not be granted with respect to any
23         claim that was adjudicated on the merits in State court proceedings unless the
            adjudication of the claim --

24
                    (1)  resulted in a decision that was contrary to, or involved an unreasonable
25         application of, clearly established Federal law, as determined by the Supreme Court
            of the United States; or

26

9

1           (2)  resulted in a decision that was based on an unreasonable determination of
2    the facts in light of the evidence presented in the State court proceeding.

3  28 U.S.C. § 2254(d).

4        A state court decision is contrary to clearly established Supreme Court precedent, within the

5  meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set

6  forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially

7  indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result

8  different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)

9  (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694

10  (2002)).

11       A state court decision is an unreasonable application of clearly established Supreme Court

12  precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct

13  governing legal principle from [the Supreme Court's] decisions but unreasonably applies that

14  principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S.

15  at 413).  The "unreasonable application" clause requires the state court decision to be more than

16  incorrect or erroneous; the state court's application of clearly established law must be objectively

17  unreasonable.  *Id*. (quoting *Williams*, 529 U.S. at 409).

18       The Supreme Court has further instructed that "[a] state court's determination that a claim

19  lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

20  correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786

21  (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has stated

22  "that even a strong case for relief does not mean the state court's contrary conclusion was

23  unreasonable." *Id*. (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, __ U.S. __, 131

24  S.Ct. 1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly

25  deferential standard for evaluating state-court rulings, which demands that state-court decisions be

26  given the benefit of the doubt" (internal quotation marks and citations omitted)).

1    The state court's "last reasoned decision" is the ruling subject to section 2254(d) review.

2    *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010).  If the last reasoned state-court decision

3    adopts or substantially incorporates the reasoning from a previous state-court decision, a federal

4    habeas court may consider both decisions to ascertain the state court's reasoning.  *See Edwards v.*

5    *Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

6    Analysis

7         Ground 1

8         In Ground 1 of his first amended habeas corpus petition, Swanson claims that "while

9    approving Swanson's self-representation, the trial court denied him any meaningful access to

10   witnesses and records which could have helped establish his defense in violation of his Sixth and

11   Fourteenth Amendment rights to present a defense through compulsory process."  First Amended

12   Petition (ECF No. 23), p. 9.

13        Swanson raised this claim on his direct appeal, and the Nevada Supreme Court ruled on it

14   as follows:

15             ... Swanson claims that the district court failed to ensure he was afforded his
            right to compulsory process.  A defendant representing himself in a criminal action
16          has a constitutional right to use the compulsory process.  [Footnote:  *Harris v. State*,
            113 Nev. 799, 803, 942 P.2d 151, 155 (1997).]  We conclude that the district court
17          correctly informed Swanson that he was responsible for obtaining subpoenas for his
            own witnesses.  [Footnote:  *See* NRS 174.305.]

18

19   Order of Affirmance, Exhibit 70, pp. 4-5.

20        During his trial -- after jury selection and before opening statements -- Swanson exercised his

21   right to represent himself and, from that point on, represented himself at trial.  *See* Transcript of

22   Trial, January 14, 2003, Exhibit 28, pp. 3-30.  He did so despite the warnings of the trial judge that

23   discharging his counsel and taking over his own representation, in the midst of the trial, might be an

24   imprudent decision, and that it was likely too late to subpoena witnesses.  *See id.*

25        In May 2001, some twenty months before his trial commenced, Swanson made a motion

26   seeking permission to represent himself, but changed his mind and withdrew the request.  *See*

Pro Se Motion, Exhibit 12; Reporter's Transcript,  May 31, 2001, Exhibit 13; Reporter's Transcript, June 6, 2001, Exhibit 14.  He then waited until after the trial started before he insisted on representing himself and was granted permission by the trial court to do so.

There is no indication in the record that the trial court prevented Swanson from subpoenaing witnesses or documents.  Rather, the record reflects that Swanson's difficulty in those regards was primarily the result of the timing of his decision to represent himself.

The essence of Swanson's claim is that the trial court did not do enough to assist him in his efforts to compel the appearance of certain witnesses.  *See, e.g.,* First Amended Petition, p. 13 ("When self-representation is allowed, the court has a duty to provide the accused the means of effecting such constitutional rights. While specific means, such as use of standby counsel, may not be required, the trial court must assure in some form that such rights of the accused to present a defense are protected.").  However, Swanson cites no authority for this contention, much less any "clearly established Federal law, as determined by the Supreme Court of the United States."  *See* 28 U.S.C. § 2254(d).

The Sixth and Fourteenth Amendments to the United States Constitution guarantee the right of a criminal defendant in state court to compel witnesses to testify.  *See Washington v. Texas*, 388 U.S. 14, 17-19 (1967).  And, in the landmark case of *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court recognized that a criminal defendant, in state court, has a right, under the Sixth and Fourteenth Amendments, to conduct his own defense.  *Faretta*, 422 U.S. at 807.  However, "[a] defendant does not have a constitutional right to receive personal instruction from the trial judge on courtroom procedure."  *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).  "Nor does the Constitution require judges to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course."  *Id*. at 184.

Moreover, in this case, while the trial judge was not required under any Supreme Court precedent to assist Swanson, the record shows that the judge did actually assist Swanson regarding his apparent wish to call certain witnesses and enter an exhibit: in canvassing Swanson regarding his

12

motion to represent himself, the trial judge warned Swanson that it was likely too late to subpoena

additional witnesses (*see* Transcript of Trial, January 14, 2003, Exhibit 28, p. 18); the trial judge

arranged for Swanson to make telephone calls to attempt to bring witnesses to trial (*see* Transcript of

Trial, January 14, 2003, Exhibit 28, pp. 108-09, and Transcript of Trial, January 15, 2003, Exhibit

29, pp. 140-41); the trial judge requested that the prosecutor contact RS' sisters and have them come

to court so that Swanson could speak to them and determine if they should testify (*see* Transcript of

Trial, January 14, 2003, Exhibit 28, pp. 109-11, and Transcript of Trial, January 16, 2003, Exhibit

30, pp. 27-29); the trial judge asked the bailiff to inquire whether Swanson's witnesses were in the

hallway outside the courtroom (*see* Transcript of Trial, January 16, 2003, Exhibit 30, p. 35); the trial

judge walked Swanson through the process of offering an exhibit into evidence (*see* Transcript of

Trial, January 16, 2003, Exhibit 30, pp. 39-40).

In his reply, Swanson focuses his argument on RS' two sisters, and asserts that the trial court

violated his rights in not ordering them to testify in Swanson's defense when they were in court on

January 15, 2003.  *See* Reply (ECF No. 56), pp. 26-30.

On January 14, 2003, the second day of trial, and the day that Swanson began to represent

himself, the following exchange occurred with the jury not present:

> MS. KOLLINS [prosecutor]:  I would just inquire of Mr. Swanson if he
> intends to call the girls to testify that the State will accommodate him and make the
> phone calls.
>
> I don't think it's appropriate he be calling the victim's house.
>
> MR. SWANSON:   I'm not gonna call the victim.
>
> THE COURT:   The victim is already on the witness stand.  You're going to
> re-call that person?
>
> MR. SWANSON:   I might re-call them later on.
>
> THE COURT:   There's not much later on involved here.  Tomorrow we're
> going to probably end up with all the testimony.
>
> MR. SWANSON:   Well, no.  I was thinking of calling the sisters.
>
> THE COURT:   Is that who you're referring to as well?

13

1    MS. KOLLINS:   I am.

2    They live with the victim.  I realize he's representing himself.  I think it's inappropriate to have him contacting the victim at, contacting the victim's home.  We

3    will call them and ask them to appear.

4    THE COURT:   Do you want them to testify?

5    MR. SWANSON:   That's cool.

6    MS. KOLLINS:  You see that predicament.

7    THE COURT:   Well, call them and ask them to be outside the court room.

8    Well, it's not appropriate for you to ask them because they are not your

9    witness.

     Do you see what I'm saying?

10    MS. KOLLINS:  I do.

11

12    THE COURT:   Call them and indicate to them that the Defendant wishes to speak with them, with the idea behind it calling them as a witness.  Have them here at 1:30.  If they are obliged to do so.  They are not compelled to do so.  If they are here

13    at 1:30 we'll let you interview them before you call them.

14    Do you understand?

15    MR. SWANSON:  All right.

16   Transcript of Trial, January 14, 2003, Exhibit 28, pp. 109-11.  The next day, January 15, 2003, the

17   third day of trial, RS' sisters were present at the trial, and Swanson was able to speak with them.  *See*

18   Transcript of Trial, January 15, 2003, Exhibit 29, p. 68.  Swanson told the court he intended to call

19   them as witnesses.  *See id*. at 68-69, 71, 82-83, 89.  However, regarding at least the older of the two

20   sisters, who was 12 years old at the time of trial, Swanson seemed to indicate that he did not wish to

21   force her to testify:

22    THE COURT:   You don't know what she's going to testify to?

23    [MR. SWANSON][4]:   Actually I don't want to put no pressure on her to be honest with you.

24

25

26   ———————————

     [4] In this part of the transcript, Swanson is erroneously referred to as "Mr. Watson."

14

1    *Id*. at 87.  Swanson made no request on that day to have the court order either of the girls to testify,

2    and, later, when the trial judge asked Swanson what other witnesses he was going to call on that day,

3    Swanson replied: "Today, um, no one."  *Id*. at 90.  And, when asked what witnesses he intended to

4    call the following day, Swanson did not mention either of RS' sisters.  *See id*. at 102-04.  The

5    following day, January 16, 2003, there was further discussion about whether RS' sisters would be

6    called by Swanson to testify.  *See* Transcript of Trial, January 16, 2003, Exhibit 30, pp. 18-32.

7    At the conclusion of that discussion, the trial judge asked Swanson:  "You're going to present no

8    case today at all?"  *Id*. at 32.  Swanson answered:  "No, sir."  *Id*.

9         The record shows, therefore, that Swanson was uncertain how RS' sisters would testify, and

10   he was uncertain and inconsistent regarding whether he wished to compel them to testify.  In this

11   court's view, the state courts' conclusion, that the trial court did not deny Swanson's right to compel

12   RS' sisters to testify, was not objectively unreasonable.  Certainly, Swanson cites no "clearly

13   established Federal law, as determined by the Supreme Court of the United States," supporting his

14   contention that under these circumstances there was a denial of his constitutional right to compulsory

15   process.  *See* 28 U.S.C. § 2254(d).

16        Moreover, assuming, for purposes of analysis only, that there was a violation of Swanson's

17   constitutional right to compel RS' sisters to testify, this court would find that any such violation was

18   harmless.  The prejudicial impact of a constitutional error is assessed by asking whether the error had

19   "a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.*

20   *Abrahamson*, 507 U.S. 619, 623 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 121–22 (2007)

21   (holding that the *Brecht* standard applies whether or not the state courts recognized the error and

22   reviewed it for harmlessness).  Swanson did not offer in state court, and he has not proffered in

23   federal court, a declaration of either of the two sisters, or any other evidence of any kind, showing

24   how they would have testified.  *See* Reply, pp. 28-30.  Swanson submits only bald speculation that

25   their testimony would have been beneficial to his defense.  *See id*.

26

1       This court finds that the state courts' denial of the claim asserted by Swanson as

2   Ground 1 of his first amended habeas petition was not contrary to, or an unreasonable application of,

3   clearly established federal law, as determined by the Supreme Court of the United States, and the

4   state courts' ruling was not based on an unreasonable determination of the facts in light of the

5   evidence presented.  *See* 28 U.S.C. § 2254(d).  Swanson does not show habeas relief corpus to be

6   warranted.  The court will deny habeas corpus relief with respect to this claim.

7       <u>Ground 2</u>

8       In Ground 2, Swanson claims that he "was denied his Sixth and Fourteenth Amendment right

9   to the effective assistance of counsel when counsel failed to properly investigate the case and defend

10  his client."  First Amended Petition, p. 14.

11      In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two

12  prong test for analysis of claims of ineffective assistance of counsel:  the petitioner must demonstrate

13  (1) that the defense attorney's representation "fell below an objective standard of reasonableness,"

14  and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a

15  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

16  would have been different."  *Strickland*, 466 U.S. at 688, 694.  A court considering a claim of

17  ineffective assistance must apply a "strong presumption" that counsel's representation was within the

18  "wide range" of reasonable professional assistance.  *Id.* at 689.  The petitioner's burden is to show

19  "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

20  defendant by the Sixth Amendment."  *Id*. at 687.  And, to establish prejudice under *Strickland*, it is

21  not enough for the habeas petitioner "to show that the errors had some conceivable effect on the

22  outcome of the proceeding."  *Id* at 693.  Rather, the errors must be "so serious as to deprive the

23  defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.

24      Where a state court has adjudicated a claim of ineffective assistance of counsel, under

25  *Strickland*, establishing that the decision was unreasonable under AEDPA is especially difficult.

26  *See Richter*, 562 U.S. at 104-05.  In *Richter*, the Supreme Court instructed:

The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Richter*, 562 U.S. at 105; *see also Cheney*, 614 F.3d at 994-95 (acknowledging double deference required to state court adjudications of *Strickland* claims).

The Nevada Supreme Court summarily affirmed the denial of this claim in its April 6, 2007, order of affirmance:

The district court found that counsel were not ineffective.

\*   \*   \*

The district court's factual findings are entitled to deference when reviewed on appeal. [Footnote: *See Riley v. State*, 110 Nev. 638, 647, 878 P.2d 272, 278 (1994).] Our review of the record on appeal reveals that the district court's findings of fact are supported by substantial evidence and are not clearly wrong. Moreover, we conclude that the district court did not err as a matter of law.

Order of Affirmance, Exhibit 102, pp. 1-2.

Below, the state district court denied Swanson's claim after a hearing. The hearing was held on August 4, 2006, with Swanson appearing *pro se*. At the hearing, Swanson's trial counsel took the witness stand and was sworn as a witness. Reporter's Transcript, August 4, 2006, Exhibit 91, p. 2. The hearing then continued as follows:

THE COURT: All right. Now, the basis in large part for the petition for a writ of habeas corpus is to challenge the effectiveness of counsel. Intertwined in this petition are various legal arguments which the Court can entertain without consulting a witness.

And I would also point out that in the trial of this matter Mr. Jorgenson [Swanson's trial counsel] assisted the defendant up and through the jury selection, but the defendant opted to represent himself thereafter.

So the ineffectiveness of this challenge goes up to the point where Mr. Jorgenson was no longer responsible for the defendant's defense.

1    Now, Mr. Swanson, we're going to begin somewhat informally.  By that I
mean that we're not going [to] adhere strictly to procedural rules here.  We're going
2    to ask questions back and forth here, the Prosecutor and myself.

3    THE DEFENDANT [Swanson]:  I don't even wish to participate, Your
Honor.
4
     THE COURT:  You don't?
5
     THE DEFENDANT:  Just go ahead and do what you're going to do.
6
     THE COURT:  You don't want to pursue your writ?
7
     THE DEFENDANT:  No.
8
     THE COURT:  Why did you file it if you didn't want to pursue it?
9
     THE DEFENDANT:  Because the result of my remedies it could go to the
10   Feds.  Go ahead and do what you're going to do.  I am not going to participate.

11   THE COURT:  Do you want to submit it on the brief?  Is that what you're
saying?
12
     THE DEFENDANT:  I submitted it.
13
     THE COURT:  All right.  That's going to suffice just a submittal.  All right.
14   We can proceed on that basis.

15   *Id*. at 3-4.  The court then went on to summarize Swanson's claims and to question Swanson's trial

16   counsel briefly about certain of them.  *Id*. at 4-10.  Regarding the claimed insufficiency of counsel's

17   pretrial investigation, the following exchange occurred:

18   THE COURT:  ... The next matter is that Mr. Jorgenson failed to call various
witnesses, as I understand it.  I'll ask your understanding Mr. Jorgenson.  We're
19   talking about the alleged victim's family.

20   Is that what your recollection is?

21   THE WITNESS:  Right.  There was an uncle and other family members who
in theory were witnesses.
22
     THE COURT:  And do you recall your thinking as to whether or not to call
23   these people?

24   THE WITNESS:  After interviewing the uncle who was the owner of the
house, and was in the words of the uncle and the police report the other adult witness,
25   potential witness to the acts, he indicated to me that his testimony wouldn't help.

26

18

1       And he indicated the other potential adult witness that Mr. Swanson wanted to
2   call was not present during any period of time in which the events would have
    occurred.

3       I attempted to call -- some I talked to, some I was not able to talk to. One was
4   in prison.  One was -- all I had was a cell phone number and wasn't able to get a hold
    of him.

5       Although that was one of the people that the uncle, who I did talk to, I went to
6   his house and spoke to him personally that was at the scene of the crime.  He
    indicated that person, who you could only get on the cell phone, wasn't present so he
    really couldn't give us any direct testimony.

7
8       THE COURT:  Well, all right.  Are you saying that in your estimation these
    witnesses would not have testified in a way that would have been beneficial to the
9   defense of this case, or they were unavailable, or a combination of the two?

10      THE WITNESS:  Combination of the two.  Mainly they would have said we
    have no knowledge of the facts, we weren't present.

11                          *   *   *

12      THE COURT:  ... Ms. Kollins [prosecutor], anything that we haven't
13  discussed here?

14      MS. KOLLINS:  No, Your Honor.  I guess the only thing that concerns the
    State is that Mr. Swanson has never made an offer of proof as to what he anticipated
15  these witnesses would all say that would have changed the outcome of the trial.

16      I know what Mr. Jorgenson gleaned from them, but Mr. Swanson has always
    just said these family members, these people that were never called.  Never has he
17  made a specific offer of proof as to what he thinks would have come out in trial that
    would have changed the outcome of the trial.

18      THE COURT:  That's true.  That's true.  We could speculate based on what
19  Mr. Jorgenson indicated.  I think it would follow that the whole family, I would think
    that the family would be a little upset with the defendant if, in fact, the allegations
20  were believed.

21      Mr. Jorgenson's investigation of each one of them certainly suggests that
    would have been the status of the matter.

22      Well, having review it the Court's of the mind that there's no merit to the
23  petition and, accordingly, it is denied.

24  *Id*. at 4-11.  In its written order, the state district court ruled as follows on Swanson's claim of

25  ineffective assistance of counsel:

26

                                        19

1          On August 4, 2006, this court heard argument on Defendant's petition.
Defendant declined to participate in the hearing and instead submitted it on his brief.
2     RT 8-4-06 [Exhibit 91], p. 3-4.  Deputy Public Defender Craig Jorgenson,
Defendant's counsel until the court, after a *Faretta* canvass, granted Defendant's
3     request to represent himself, was present and examined by the court.

4          Defendant received effective assistance of counsel up until the time that
Defendant's motion to continue his trial in proper person was granted.
5
          Defendant's complaint that Mr. Jorgenson was ineffective for failing to
6     interview and/or call witnesses Defendant believed were essential to his defense is
completely unsupported.  Mr. Jorgenson testified at the evidentiary hearing that
7     Defendant wanted him to call certain family members of the victim's family,
however, these witnesses indicated to Mr. Jorgenson that their testimony would
8     not help as they were not present at the time of the alleged incident.  RT 8-4-06
[Exhibit 91], p. 4-5.  Other witnesses were either incarcerated, unavailable or
9     unresponsive despite attempts to reach them.  *Id.*  As such, Mr. Jorgenson concluded
that these alleged exculpatory witnesses would not assist Defendant in his defense any
10    way.  *Id.* at 5-6.

11         The record is clear that counsel did not believe these witnesses would assist
Defendant in any way in his defense and he felt strongly enough about it that he
12    preferred to withdraw from the case [rather] than call them and hurt his client.

13             Court:  The question is rather simple, I suppose.  That is, Mr.
               Jorgenson, do you feel that you cannot call these witnesses,
14             notwithstanding the fact that your client requests such, or do you think
               you should call them at his request and see what they have to say? ...
15
               Mr. Jorgenson:  No.  I would not call any of these witnesses.
16
               Court:  You don't think you can represent your client if he insists on
17             calling these people?

18             Mr. Jorgenson:  That's correct.

19    RT 1-14-03 [Exhibit 28], p. 14-15.

20         Further, Defendant failed to show how a better investigation would have
rendered a more favorable outcome probable.
21                                    *     *     *
22         Defendant has failed to show that Mr. Jorgenson's performance fell below an
23    objective standard of reasonableness and that but for his counsel's alleged deficient
performance there was a reasonable probability that the outcome of his case would
24    have been different.

25    Findings of Fact, Conclusions of Law and Order, Exhibit 96, pp. 3-4 (paragraph numbering omitted).

26         This court finds objectively reasonable the state courts' conclusion that Swanson failed to

show that the performance of his trial counsel, with respect to the investigation of potential witnesses, fell below an objective standard of reasonableness.  Trial counsel took steps to determine whether the potential witnesses would testify in a manner helpful to the defense, and determined that they would not.

Furthermore, this court also finds objectively reasonable the state courts' conclusion that Swanson failed to show that, but for his counsel's alleged deficient performance, there was a reasonable probability that the outcome of his case would have been different.  Swanson simply made no showing at all in the state habeas proceeding that his defense could have benefitted from the testimony of any of the witnesses he contends his trial counsel should have better investigated.

In this federal habeas action, Swanson proffers the declaration of investigator Patricia Schoenfeld, who interviewed Swanson's brother, Donald Swanson, one of the potential witnesses Swanson contends his counsel should have better investigated.  *See* Declaration of Patricia Schoenfeld, Exhibit 105.  In that declaration, dated September 5, 2008, Schoenfeld states that Donald Swanson was incarcerated at a Nevada prison when she interviewed him.  *Id.* at 1. According to the declaration, Donald Swanson claimed that, on the night Swanson allegedly sexually assaulted RS, he, Donald Swanson, spent the night at Jimmy Swanson's apartment.  *Id.* at 2. According to the declaration, Donald Swanson claimed that on that night, Jimmy, RS, and one of RS' sisters slept upstairs in the apartment, and he, Swanson, and Swanson's other brother, Anthony, slept downstairs.  *Id.* at 2.  According to the declaration, Donald Swanson claimed that RS "never told him that Tony [Swanson] touched her," and he claimed that "he never heard [RS] upset that night."  *Id.*  According to the declaration, Donald Swanson claimed that he heard Swanson deny "touching" RS.  *Id.*  According to the declaration, Donald Swanson claimed in the interview that "he did not believe that Tony [Swanson] had gone upstairs to the girl's room and touched [RS], because her grandfather's room was located across the hallway from hers."  *Id.*  Of course, Swanson did not offer the Schoenfeld declaration as evidence in state court, and he did not offer any other sort of evidence in state court to show how Donald Swanson would have testified at his trial.  *See*

1  Reporter's Transcript, August 4, 2006, Exhibit 91; Findings of Fact, Conclusions of Law and Order,

2  Exhibit 96.  Rather, Swanson refused to participate in the hearing on his state court habeas petition,

3  and he offered no evidence at all in that proceeding.  *See*  Reporter's Transcript, August 4, 2006,

4  Exhibit 91, pp. 3-4.  "Review under § 2254(d)(1) is limited to the record that was before the state

5  court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

6  "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review.  If a claim has been

7  adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of

8  § 2254(d)(1) on the record that was before that state court."  *Id*. at 1400.

9          This court finds that the state courts' denial of the claim asserted by Swanson as Ground 2 of

10  his first amended habeas petition was not contrary to, or an unreasonable application of, clearly

11  established federal law, as determined by the Supreme Court of the United States, and the state

12  courts' ruling was not based on an unreasonable determination of the facts in light of the evidence

13  presented.  *See* 28 U.S.C. § 2254(d).  Swanson does not show habeas relief to be warranted.  The

14  court will deny habeas corpus relief with respect to this claim.

15  Certificate of Appealability

16          The standard for issuance of a certificate of appealability calls for a "substantial showing

17  of the denial of a constitutional right."  28 U.S.C. §2253(c).  The Supreme Court interpreted

18  28 U.S.C. §2253(c) as follows:

19          Where a district court has rejected the constitutional claims on the merits, the
        showing required to satisfy § 2253(c) is straightforward:  The petitioner must
20          demonstrate that reasonable jurists would find the district court's assessment of the
        constitutional claims debatable or wrong.

21

22  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79

23  (9th Cir. 2000).  The Supreme Court further illuminated the standard in *Miller-El v. Cockrell*,

24  537 U.S. 322 (2003).  The Court stated in that case:

25

26

1
2
3
4
5

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus.  Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.  As we stated in *Slack*, "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

6  *Miller-El*, 123 S.Ct. at 1040 (quoting *Slack*, 529 U.S. at 484).

7    The court has considered Swanson's claims in Grounds 1 and 2 of his first amended habeas

8  petition, with respect to whether either satisfies the standard for issuance of a certificate of appeal,

9  and the court determines that neither does.  The court will deny Swanson a certificate of

10  appealability.

11    **IT IS THEREFORE ORDERED** that the Clerk of the Court shall update the docket in this

12  case to substitute Dwight Neven for E.K. McDaniel as the respondent warden, and to substitute

13  Adam Paul Laxalt for Catherine Cortez Masto as the respondent Nevada Attorney General.

14    **IT IS FURTHER ORDERED** that petitioner Tony DeAngelo Swanson's First Amended

15  Petition for Writ of Habeas Corpus (ECF No. 23) is **DENIED**.

16    **IT IS FURTHER ORDERED** that petitioner is denied a certificate of appealability.

17    **IT IS FURTHER ORDERED** that the Clerk of the Court shall **ENTER JUDGMENT**

18  **ACCORDINGLY.**

19
20    Dated this 27th day of April, 2015.

21
22  _____
23  UNITED STATES DISTRICT JUDGE
24
25
26

23